UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RING & PINION SERVICE, INC., | CASE NO. C09-0586 |
| Plaintiff, | ORDER ON CLAIM CONSTRUCTION |
| v. | |
| ARB CORPORATION LTD., | |
| Defendant. | |

# I. INTRODUCTION

This patent infringement action is now before the Court for a ruling on claim construction. The Court held a *Markman*[1] hearing in this case on February 24, 2010. The Court has fully considered the parties' memoranda and exhibits and relevant case law, and now issues this Order on claim construction.

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

## II. BACKGROUND

Plaintiff Ring & Pinion, Inc. ("R&P") filed this patent infringement action seeking a declaratory judgment of non-infringement.  ARB Corporation, Ltd. ("ARB") is counterclaiming, alleging that Plaintiff has infringed its United States Patent No. 5,591,098 ("the '098 patent"), titled "Locking Differential."  This patent teaches a device for allowing a vehicle's wheels to move at different speeds relative to each other by means of a locking mechanism activated by compressed air.  The patent entails a locking means, actuator, and cylinder means all positioned on the same side of the pinion gear.  Previous locking differentials had these components on different sides of the pinion gear.  The placement of all these components on the same side of the pinion gear represented an improvement by allowing differentials to be smaller and more affordable to produce.

The parties do not dispute that the placement of all of these components on one side indicates that the locking means, actuator, and cylinder means are positioned on the same side of a plane extending through the center of the pinion.  However, if a device is produced in which any part of the locking means, actuator, or cylinder means cross over the center of the pinion, that device would be non-infringing.  The spring and its housing cross over the center line on R&P's allegedly infringing device.  R&P argues that because the spring and the cylinder containing compressed air are force-exerting components, which constitute part of the actuator, its device is non-infringing.  ARB contends that the actuator does not include any force-exerting elements and merely converts received forces into motion.  R&P also argues that the cylinder means must house the entire actuator, while ARB contends that it houses only the piston portion of the actuator.

**A. The '098 Patent**

The '098 patent is titled "Locking Differential."  The patent was filed on February 9, 1995 and was issued on January 7, 1997.  The abstract summarizes the device in the following way:

> A locking differential comprising a differential carrier housing a pair of bevel gears and at least one pinion gear which meshes with the pair of bevel gears, a locking ring positioned within the differential carrier between the carrier and one of the bevel gears and splined to the carrier … locking teeth on the bevel gear, an annular cylinder formed in the carrier and receiving a locking ring whereby the charging of the cylinder with compressed air causes the locking ring to move into its locking position with the teeth engaging the teeth against the action of springs to lock the differential. The locking ring is located within a shaped cover plate which closes the differential carrier and provides the bearing support for the bevel gear.

The patent recites twenty-one claims, at least two of which–claims 1 and 17–contain the disputed terms.  The parties identified in their Joint Claim Construction and Prehearing Statement (Dkt. #19) the following terms in the '098 patent to be construed by the Court:

(1) "actuator"

(2) "cylinder means"

Representative claims 1 and 17 of the '098 patent, with the disputed terms set forth in **bold**, are fully set forth here:

1. A locking differential comprising

a differential carrier housing a pair of bevel ears [sic] and at least one pinion gear which meshes with said pair of bevel gears,

a locking means positioned within said differential carrier between said differential carrier and one of said bevel gears and keyed or splined to the carrier.

said locking means including locking teeth or spline means,

said one of said bevel gears being formed with cooperating teeth or spline means,

**cylinder means** formed in said differential carrier housing an **actuator** position to cause movement of said locking means relative to said carrier, whereby said locking teeth or spline

means on said locking means engage said teeth or spline means on said one bevel gear to prevent rotation of said one bevel gear relative to said carrier to thereby lock said differential,

said locking means and said **cylinder means** being positioned adjacent said one of said bevel gears, and

a shaped cover plate forming part of said differential carrier and structured and arranged to support said one of said bevel gears, and

said cover plate comprising a cavity formed therein and in which said locking means is located,

wherein said locking means is positioned on only one side of said pinion gear,

said **actuator** and **cylinder means** are positioned on only one side of said pinion gear, and

said locking means, **actuator** and **cylinder means** are all positioned on the same side of said pinion gear.

'098 patent, col. 3, lines 44-66; col 4, lines 1-9.

17. A kit for convening a differential to a locking differential, said kit including

a differential carrier structured and arranged to support a pair of bevel gears and at least one pinion gear therein,

a locking means structured and arranged to be keyed or splined to said differential carrier so as to be capable of axial movement relative to said carrier between said carrier and one of said bevel gears,

said locking means including locking tooth or spline means,

a replacement bevel gear formed with tooth or spline means which are structured and arranged to co-operate with said tooth or spline means associated with said locking means o prevent rotation of said one bevel gear relative to said carrier,

said carrier being formed with **cylinder means** structured and arranged to house an **actuator** for causing axial movement of said locking means relative to said carrier in use,

said locking means and said **cylinder means** being positioned adjacent said one of said bevel gears, and

a shaped cover plate forming part of said differential carrier and structured and arranged to support said one of said bevel gears and comprising a cavity in which said locking means is arranged to be located,

wherein said locking means is structured and arranged to be positioned on only one side of the pinion gear, and

said **actuator** and **cylinder means** are structured and arranged to be positioned on only one side of pinion gear, and

said locking means, **actuator** and **cylinder means** are all structured and arranged to be positioned on the same side of the pinion gear.

'098 patent, col. 5, lines 19-36; col 6, lines 1-16.

# III. DISCUSSION

## A. Legal Standard

The claims of a patent define the limits of the patentee's statutory right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir.2005). The meaning and scope of the claim language is a question of law for the court. See *Markman v. Westview Instruments*, 52 F.3d 967, 976-79 (Fed.Cir.1995).

Patents are addressed to practitioners in the field of the patented invention, so a court should usually construe claim language consistent with its "ordinary and customary meaning" to a person of ordinary skill in the relevant art on the effective filing date of the patent application. *Phillips*, 415 F.3d at 1312-13. "Such a person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." Id. at 1313 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed.Cir.1998)).

To determine the "ordinary and customary meaning" of a claim term, a court should first consult the intrinsic evidence, which consists of the claims, the specification, and the prosecution history. *Primos, Inc. v. Hunter's Specialties, Inc.,* 451 F.3d 841, 847-48 (Fed.Cir.2006) ("In ascertaining the ordinary and customary meaning of a claim term, a court's primary focus should be on the intrinsic evidence of record, viz., the claims, the specification, and, if in evidence, the

1    prosecution history."); *Kinik Co. v. Int'l Trade Commission*, 362 F.3d 1359, 1365 (Fed.Cir.2004)

2    ("The words of patent claims have the meaning and scope with which they are used in the

3    specification and the prosecution history.").  Prior art cited to the examiner during prosecution is

4    considered part of the prosecution history. *See Phillips*, 415 F.3d at 1317.

5            It is "[a] fundamental rule of claim construction [] that terms ... are construed with the

6    meaning with which they are presented in the patent document. Thus claims must be construed

7    so as to be consistent with the specification ...." *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*,

8    347 F.3d 1367, 1370 (Fed.Cir.2003) (citations omitted).  Therefore, the patent specification has

9    been called the most important guide to claim construction.  See, e.g., *Vitronics Corp. v.*

10   *Conceptronic, Inc.*, 90 F.3d 1576, 1582 ("[The specification] is always highly relevant to the

11   claim construction analysis. Usually, it is dispositive."); *Phillips*, 415 F.3d at 1315-16 ("The best

12   source for understanding a technical term is the specification from which it arose, informed, as

13   needed, by the prosecution history." (quoting *Multiform Desiccants*,133 F.3d at 1478)).

14           The specification may show that a patentee has provided its own definitions for claim

15   terms or has narrowed the scope of the claims through disclaimer. *See Phillips*, 415 F.3d at 1316.

16   In such cases, the claim is construed according to the patentee's expressed intent even if the

17   resulting construction departs from the ordinary meaning of the claim language. *Id.*; *Honeywell*

18   *Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed.Cir.2007) ("When a

19   patentee defines a claim term, the patentee's definition governs, even if it is contrary to the

20   conventional meaning of the term.") A patentee may redefine a term either explicitly or

21   implicitly.  *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1367 (Fed.Cir.2003) ("The

22   applicant may also act as his own lexicographer and use the specification to implicitly or

23   explicitly supply new meanings for terms"); *Bell Atlantic Network Servs.,Inc. v. Covad*

24

ORDER ON CLAIM CONSTRUCTION - 6

1   *Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed.Cir.2001) ("[T]he specification may

2   define claim terms 'by implication' such that the meaning may be 'found in or ascertained by a

3   reading of the patent documents.")

4         Though claims should be interpreted in light of the specification, it is not generally

5   appropriate to import limitations from the specification into the claims. *North American*

6   *Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed.Cir.2005) ("[U]nless

7   required by the specification, limitations that do not otherwise appear in the claims should not be

8   imported into the claims."); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F.3d 1284, 1289

9   (Fed.Cir.2005) ("We have repeatedly made clear that limitations cannot be imported from the

10  specification into the claims."); *SciMed Life Systems., Inc. v. Advanced Cardiovascular Systems*,

11  Inc., 242 F.3d 1337, 1340 (Fed.Cir.2001) (referring to the plaintiff's characterization of reading a

12  limitation from the written description into the claims as "one of the cardinal sins of patent

13  law"). On the other hand, "the claims cannot be broader in scope than the invention that is set

14  forth in the specification." *On Demand Machine v. Ingram Industries*, 442 F. 3d 1331, 1340

15  (Fed. Cir.2006). The determination of balance point between these two considerations—

16  interpreting the claims in light of the specification, on the one hand, and guarding against

17  improperly importing limitations from the specifications into the claims—turns on "how the

18  specification characterizes the claimed invention." *Alloc, Inc., v. International Trade*

19  *Commission,* 342 F. 3d 1361, 1370 (Fed.Cir. 2003).

20        The scope of a claim is usually not limited to the particular embodiment or embodiments

21  described in the specification. *See, e.g., Resonate Inc. v. Alteon Websystems, Inc*., 338 F.3d 1360,

22  1364-65 (Fed.Cir.2003) ("[A] particular embodiment appearing in the written description may

23  not be read into a claim when the claim language is broader than the embodiment.") In order to

24

ORDER ON CLAIM CONSTRUCTION - 7

1    determine whether the limitations of an embodiment should be applied to a claim, a court must

2    determine whether a person of skill in the art would consider the embodiments to be merely

3    exemplary, or whether they are intended to define the scope of the claim. *Phillips*, 415 F.3d at

4    1323; *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed.Cir.2006).

5           The prosecution history, also part of the intrinsic evidence, may "inform the meaning of

6    the claim language by demonstrating how the inventor understood the invention and whether the

7    inventor limited the invention in the course of prosecution, making the claim scope narrower

8    than it would otherwise be." *Phillips*, 415 F.3d at 1317. However, the prosecution history "often

9    lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*.

10          The court may also consider extrinsic evidence. *Id*. "Extrinsic evidence is that evidence

11   which is external to the patent and file history, such as expert testimony, inventor testimony,

12   dictionaries, and technical treatises and articles." *Vitronics*, 90 F.3d at 1584. While a district

13   court may consult extrinsic evidence as part of the claim construction analysis, such evidence is

14   considered less reliable than the intrinsic evidence. *Phillips*, 415 F.3d at 1317-19 ("[T]he court

15   should keep in mind the flaws inherent in each type of [extrinsic] evidence and assess that

16   evidence accordingly.") While the testimony of expert witnesses may be useful in some cases, a

17   court should disregard expert testimony that is merely conclusory or that is inconsistent with the

18   intrinsic evidence. *Id*. at 1318.

19          A court may use general purpose dictionaries as an aid to claim construction, so long as

20   the dictionary definition relied upon does not contradict the definition indicated by the intrinsic

21   evidence.  *See id*. at 1322-23 (stating that courts "may ... rely on dictionary definitions when

22   construing claim terms, so long as the dictionary definition does not contradict any definition

23   found in or ascertained by a reading of the patent documents."). The Federal Circuit has

24

specifically noted that dictionaries may be useful in the construction of ordinary, non-technical terms, which often involves "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314; see also, *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376 (Fed.Cir.2006) (affirming district court construction of "stack" based on dictionary definition); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1306 (Fed.Cir.2006) (using dictionary definition in construction of claim term "geometry").  However, excessive reliance on dictionary definitions is improper because the "ordinary meaning" of a claim term is not the abstract dictionary definition, but the "meaning to the ordinary artisan after reading the entire patent." *Phillips*, 415 F.3d at 1321.

Despite the guidelines outlined above, "there is no magic formula or catechism for conducting claim construction," and a court is not "barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324. Instead "what matters is for the court to attach the appropriate weight ... to those sources in light of the statutes and policies that inform patent law." *Id*. The terms shall be construed as having their "ordinary and customary meaning" to a person of ordinary skill in the relevant art on the effective filing date of the patent application.  *Id.* at 1312-13.

**B. Analysis**

   1.  <u>Acuator</u>

The parties ask the Court to construe the claim element "actuator."

ARB proposes the following construction for this term:

"Actuator" – A device that converts received forces into motion; an actuator does not include the elements that exert the received forces.

Ring & Pinion proposes the following construction for this term:

1    "Actuator" – A device which converts an input energy or motion to a controlled output

2    motion in order to accurately position a load and return it to the original position.

3

4    The term is first used in claim 1, describing an "actuator position to cause movement of

5    said locking means relative to said carrier."  '098 patent, col. 3, lines 56-57.  The parties dispute

6    whether the term "actuator" includes the force-exerting elements.   As such, ARB contends an

7    "actuator" converts received forces into motion.  By contrast, R&P contends that an "actuator"

8    not only converts energy into motion, but also contains the elements that supply the energy.  In

9    essence, R&P argues that the cylinder (and the pneumatic force contained within the cylinder)

10   that locks the differential, and the return spring, which provides a mechanical force unlocking the

11   differential when compressed air is absent, are part of the actuator.

12   R&P puts forth that the claim language (noted *supra*) plainly states that an actuator must

13   be able to "cause movement" of the locking means.  Therefore, according to R&P, an actuator

14   must have the ability to cause movement, rather than the mere ability to be moved in response to

15   an external force.  ARB contends that movement need not be self-generated, but can be caused

16   by a component that transmits a force.  To support the notion that the patent did not describe a

17   device in which movement must be self-generated, ARB highlights analogous claim language

18   that describes "a locking ring splined to said carrier and slidable axially to cause engagement

19   between splined teeth…"  '98 patent, col. 4, lines 34-37.  This claim language illustrates an

20   instance in which the patent refers to the movement of a locking ring using similar language –

21   notably the word "cause," which indicates the movement generated by an external force.

22   Similarly, language in the specification describes the locking ring as a passive element, moved

23   by external force:  "The compressed air drives the piston…and causes the locking ring 6 to

24

1   move…" '098 patent, col. 3, lines 4-6.  In this way, force-generating components are external to

2   the actuator, and the actuator serves to convert externally applied forces and thereby cause

3   movement, as described in claim 1.  Thus, the language included in the specification and claims

4   tend to support the proposition that the meaning of "actuator" does not include the force-

5   generating elements.

6         Further support for ARB's position is found upon a reading of the embodiment contained

7   within the patent's specification.  "A patent claim should be construed to encompass at least one

8   disclosed embodiment in the written description portion of the patent specification." *Johns*

9   *Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998).  "A claim construction that

10   does not encompass a disclosed embodiment is thus 'rarely, if ever, correct and would require

11   highly persuasive evidentiary support.'" *Id.* (quoting *Vitronics Corp. v. Conceptronics, Inc.* 90

12   F.3d 1576, 1583 (Fed.Cir.1996).  R&P's construction of the term "actuator" would result in the

13   exclusion of the sole embodiment contained in the specification of the patent at issue.  The sole

14   embodiment and the claims require the actuator to be positioned on the same side of the pinion

15   gear as the locking ring.

16         Though R&P seeks to construe the claims to include force-generating elements as part of

17   the actuator, such a construction poses difficulties when the patent clearly requires the actuator

18   and locking ring to be positioned on the same side of the pinion gear.  Specifically, R&P argues

19   (as discussed *supra*) that the cylinder (and the pneumatic force contained within the cylinder)

20   that locks the differential, and the return spring that provides a mechanical force unlocking the

21   differential when compressed air is absent, are part of the actuator.

22         Yet R&P stops short of arguing that the air passage and pipe must be construed as part of

23   the actuator.  If the air passage and pipe were to be included as part of the actuator, the actuator

24

1    would not all be contained on the same side of the pinion gear, and therefore would not comport

2    with the patent's uncontested requirement that the actuator be contained on one side.  R&P

3    acknowledges that an interpretation which includes the cylinder (and the compressed air inside

4    of it) as part of the actuator, but excludes the passage and pipe from being construed as part of

5    actuator, requires a distinction to be made between the former and the latter.  R&P submits that,

6    unlike the cylinder, neither the pipe nor the passageway exerts force against the piston.

7    However, the specification states that "[c]ompressed air is delivered to the cylinder 12 via the

8    pipe 16 and passage 14 by actuation of a valve suitably located in the driver's cabin of the

9    vehicle to which the differential is fitted.  The compressed air drives the piston 11 and seal 11a

10   axially in the cylinder 12 and causes the locking ring 6 to move the spline teeth…"  '098, col. 3,

11   lines 1-9.  In other words, the compressed air travels through the pipe and passage, and then

12   enters the pneumatic cylinder.  The air travels through the cylinder, and then pushes against the

13   piston of the actuator.  It is inconsistent to make a distinction between the cylinder, on the one

14   hand, and the pipe and passageway, on the other, when each element serves as a vessel through

15   which compressed air is transported.  The more appropriate distinction is to be made between the

16   pipe, passageway, and cylinder through which compressed air travels on the one hand, and the

17   piston against which the force is exerted, on the other.  It is undisputed that the pipe and

18   passageway were not intended to be construed as part of the actuator.  In the end, the cylinder is

19   more fittingly grouped with the pipe and the passageway for the aforementioned reasons.

20   Therefore, in the context of this patent, the Court construes the term "actuator" to not include the

21   elements that exert the received forces.

22        2. Cylinder Means

23             The parties ask the Court to construe the claim element "cylinder means."

24

1   ARB proposes the following construction for this term:

2       "Cylinder means" – a chamber shaped to mate with a piston portion of the actuator and

3       allow for axial sliding of the piston.

4   R&P proposes the following construction for this term:

5       "Cylinder means" – a cavity formed in the differential carrier, for housing the actuator.

6

7   The term is first used in claim 1, describing a "cylinder means formed in said differential carrier

8   and housing an actuator position." '098 patent, col. 3, lines 55-56.  Specifically, the parties

9   dispute whether the "cylinder means" encompasses the entire actuator, as argued by R&P, or

10  whether, as proposed by ARB, the "cylinder means" is shaped to mate with the piston portion of

11  the actuator and allow for axial sliding of the piston.

12      The language in claim 1, described *supra*, refers to the "cylinder means" as housing an

13  actuator.  '098 patent, col. 3, lines 55-56.  The language does not specify that the "cylinder

14  means" houses only the piston portion of the actuator, or simply a portion of the actuator.

15  Nonetheless, ARB argues that the term "cylinder means" as used in the '098 patent houses only

16  the piston portion.  Taken alone, it would be reasonable to conclude, as R&P contends, that the

17  cylinder means as described does indeed house the entire actuator.  However, as noted by ARB,

18  there is no language that affirmatively states that the entire actuator is housed within the

19  "cylinder means."  Therefore, the specific language describing the "cylinder means" is vague

20  enough such that either construction could potentially apply.  Fortunately, there is other language

21  in the claims which provides strong evidence as to what the term "cylinder means" signifies.

22      R&P's proposed construction of "cylinder means" as a "cavity" lacks support upon a

23  further examination of the claim language.  Claim 1 describes "said cover plate comprising a

24

cavity formed therein and in which said locking means is located." '098 patent, col. 4, lines 1-2. The fact that the claim language uses the word "cavity" distinctly to describe a space formed within the differential carrier militates against finding that the term "cylinder means" also refers to a "cavity" when the two terms are both used in the claims.  See *Bancorp Services, L.L.C. v. Hartford Life Insurance Co.*, 359 F.3d 1367, 1373 (Fed.Cir. 2004).  While *Bancorp* establishes that the use of two terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each, the decision also states that such an inference is not conclusive and may be rebutted.  *See id*.  However, in this case, extrinsic evidence of the definition of the term "cylinder" supports the proposition that the patent used the term "cylinder means" and "cavity" to signify two different things.  R&P's proposed construction of the term "cylinder means" as containing the entire actuator does not comport with the traditional definition of the term "cylinder" as such a space would not adhere to a cylindrical shape.  The use of both the term "cylinder means" and "cavity" within the same claim, combined with the definition of the term "cylinder" leads to the conclusion that the term "cylinder means" as employed in the patent refers to a cylinder that mates with the piston portion of the actuator.  The Court therefore construes the term "cylinder means" as a chamber shaped to mate with a piston portion of the actuator and allow for axial sliding of the piston.

## IV. CONCLUSION

The Court has now construed the terms in the patent in suit, reading the claims "in view of the specification, of which they are a part." *SciMed Life Systems*, 242 F.3d at 1340, (*quoting Markman*, 52 F. 3d at 979-990.  The disputed terms are construed as follows:

(1) "actuator" does **not include** the elements that exert the received forces.

1    (2) "cylinder means" is a **chamber shaped to mate with a piston portion of the**

2        **actuator and allow for axial sliding of the piston.**

3

4    Dated February 18, 2011.

5

6

7                                                RICARDO S. MARTINEZ

8                                                UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24